Good morning, counsel. So it's my understanding that the two defense counsels are going to split their time. Yes, Your Honor. And you're taking eight minutes. Yes, Your Honor. And co-counsel's taking seven minutes. That is correct, Your Honor. All right. Please proceed. Good morning, Your Honors. May it please the Court. My name is Ted Samsel-Jones. I represent Appellant Joseph Shayota. Your Honors, our lead claim on appeal concerns the admission of former testimony under the Confrontation Clause. And on that, I'll start with a point that I take to be undisputed. That is that the exception for former testimony at common law was narrower than the exception for former testimony under the Federal rules. The historical evidence on that point is overwhelming. And indeed, if you read the Advisory Committee notes to Rule 804, the Advisory Committee explains very clearly and explicitly why it made the decision to expand the admission, the allowance for admission of former testimony. But the common law was narrower, and I don't think the government disputes that point. What really is in dispute between the parties is the method of constitutional interpretation that this Court should apply. The government's position is that the Sixth Amendment should be interpreted in accordance with the rules of evidence. Our position is that the Sixth Amendment should be interpreted in accordance with its original public meaning, in other words, the right of confrontation as it existed at common law. So, counsel, you wouldn't disagree that former testimony is used all the time in criminal cases? Former testimony is used frequently in criminal cases, and there are certainly situations where it would be allowable both under the rules and under the common law. For example, testimony preliminary hearings, Rule 15 depositions. Those are admissible. This is a very different situation, Your Honor. It is, but I'm just wondering why you think we should hearken back to the common law as opposed to our developed rules on admission of former testimony. Your Honor, let me respond to that with a quote from Crawford. This is at page 54. Okay. The court in Crawford said, The Confrontation Clause is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions at the time of founding. So that is what the Supreme Court said in Crawford, and that's the same approach it has followed since in cases like Giles and Melendez-Diaz. It has said that hearsay evidence is admissible under the Confrontation Clause if and only if it was admissible at common law as of the time of founding, in other words, as of 1791 for the purposes of the Sixth Amendment. So the Supreme Court has said very clearly that that is exactly how the Confrontation Clause should be applied, is to hearken back to what it meant at the time of the founding. What is the harm if this testimony is admitted? In other words, couldn't it be argued that it was harmless, whatever was said in that testimony, with respect to the rest of the case? Absolutely not, Your Honor. Your Honor, this was a huge portion of the government's case, and just one aspect of it is just the sheer bulk of it. This was a case with only about five days of evidence presented. The government spent a full day of that, in fact, a little bit more than a full day, reading Mr. Jamil's deposition into evidence. It was something like 20 percent of the government's entire case, just in terms of the time. Beyond that, Your Honor, and even more importantly, Mr. Jamil's testimony was the only direct testimony on the point of Mr. Sciotta's knowledge with and participation in the conspiracy. There was other evidence that the government presented as corroboration, but Mr. Jamil was the only one who could say, Joseph Sciotta knew what I was doing, was aware of it, and was part of this criminal conspiracy. It was the only direct evidence on that point. He was, indeed, the government's key witness for Mr. Sciotta's guilt. And, Your Honor, all we are asking for is an opportunity to question him on the stand. All we are asking for is that he be brought into court in front of the jury, placed under oath, and cross-examined. He is the chief accuser against the government. Counsel, let me ask you this. What do you do with cases that have come from this circuit, including United States v. Yeato, which says that Federal Rule of Evidence 804 implements the command of the confrontation clause? Isn't that inconsistent with your argument that we have to go back to the common law to determine the admissibility? No, Your Honor, because Yeato goes on to say, and I think that's kind of a shorthand statement, but implementing the command is not the same as saying it's coextensive. And Yeato goes on to say very clearly the confrontation clause might be different. And Judge Gould, in his concurrence, says very forcefully the confrontation clause is, in fact, different. Well, of course the concurrence is not the majority opinion. And it appears to me that we were saying in that case that Federal Rule of Evidence 804 encapsulates the rubric of the confrontation clause. Your Honor, I think using general words, and the Court in Duena said it's sort of generally consistent with, and they may be generally overlapping, but they are not the same. And this Court has never said they are the same. Well, but aren't we to apply the Federal rules in terms of determining whether or not the evidence is admissible? Your Honor, when the prosecution admits hearsay in a criminal case, it must comply both with the confrontation clause and also the Federal Rules of Evidence. Our position is that it is admissible under neither. But, Your Honor, it is also our position that the confrontation clause is not coextensive with the Federal rules. Well, not absolutely, but we've looked at them together. I mean, I don't do you have a case where we've actually gone back to the common law and applied the common law, the common law admissibility standards? No.   But I would like to understand whether the prosecution is to, to an objection under the confrontation clause. What case does that specifically? Crawford. Well, okay. Melendez-Diaz. Okay. Giles v. California. Okay. All of those cases. And, Your Honor, just by way of analogy. But Crawford is talking about in terms of whether or not the testimony is, whether the Crawford testimony is actually testimonial in nature. Indeed, Your Honor, but think about Giles. The question in Giles is what is the scope of the former of, I'm sorry, of the forfeiture exception. And the Supreme Court said the same thing. You determine the scope of the forfeiture exception to the confrontation clause by reference to the forfeiture exception as it existed in 1791. That is, again, what we are asking this Court to do. There's an unrelated point, Your Honor. Judge O'Scanlan wrote an opinion just a couple months ago in United States v. Henderson on the Fourth Amendment and said exactly the same thing. The Fourth Amendment must be interpreted in accordance with its original public meaning, which means interpreted in accordance with the right as it existed at common law. That is exactly what we are asking this Court to do. And, Your Honor, I would not. Well, we don't have a Federal rule of evidence for the Fourth Amendment issues. But there was an issue there with the rules of criminal procedure. And, again, as the Court wrote in Henderson, and as Judge O'Scanlan wrote, it is not a question of what's permissible under the rules of criminal procedure, it's a question of what was permissible under the warrant requirement as of 1791. And, again, Your Honor, that is exactly the approach we are asking this Court to follow here. All right. Your Honor, I would reserve the remainder of my time. All right. Thank you. Thank you. Good morning. May it please the Court. Good morning. My name is John Kline. I represent Adriana Sciotta. I'd like to save a minute for rebuttal. Also, I woke up with a cold this morning, so please forgive my cloak. Just pull the microphone up so we can hear you, please. Thank you. Ms. Sciotta joins Mr. Sciotta's Confrontation Clause argument. I'm not going to repeat that argument. I did want to make one point in response to Judge O'Scanlan's question about harmless error. I think it's important to bear in mind that when you're talking about the Confrontation Clause, it's harmless beyond a reasonable doubt, which is a pretty stringent standard for the government to meet. And for the reasons counsel pointed out, I don't believe that error was harmless beyond a reasonable doubt. I want to address in my few minutes here a separate Sixth Amendment issue that goes to Mrs. Sciotta only, and that's the ineffective assistance of counsel issue. I will say at the outset, it is odd to have an ineffective assistance of counsel issue on direct appeal. We happen to have a complete record here because of the way things played out post-trial. The government agrees with that, and of course we agree with that. But don't we generally want to hear from counsel in more detail before we decide ineffective assistance of counsel cases? Well, generally you do want to hear from counsel. In more detail. Well, here there was plenty of detail because Judge Koh found very quickly that there was a waiver of the attorney-client privilege. The government interviewed both lawyers at great length, Mr. Vega for about an hour and Mr. McMullin for about half an hour. And there's a summary of those interviews that the government included in a pleading that's included in the excerpts of record. So there was a full opportunity to explore that in detail. And of course, had there been need for further development, we could have had an evidentiary hearing. I don't think either Judge Koh or anybody else felt that that was necessary given the      Thank you. Yes. Thank you. So, did you hear about the attorney advice? Is that whether or not the payments could be made out of the account? Is that what you're talking about on ineffective assistance of counsel? Yes, Your Honor. I'm sorry. No, go ahead. Okay. A critical piece of evidence against Ms. Cheyotta. There wasn't a lot of evidence against Ms. Cheyotta. That's one of our arguments.  made on November 2nd, 2012. And the government viewed that as an evidence that had to be made. And the government viewed that payment as evidence of consciousness of guilt. And it was mentioned in the government's closing. It was mentioned in the government's rebuttal. It was mentioned by the district court. There was a significant piece of evidence in the case against Ms. Cheyotta, and a case where there wasn't a lot of evidence. And she wanted to show that she had been told that it was legal? Yes. This is the point. She consulted a lawyer, Mr. Vega, a former U.S. attorney for the Southern District of California, before she made that transfer. She went to Mr. Vega. She asked him if it was okay to make the transfer. He told her it was, and then she made the transfer. And she didn't just make the transfer of the $2 million to pay outstanding invoices. She also sent $100,000 to Mr. Vega as a retainer in the case. Wasn't there a question as to whether he told her before or after the transfer was made? Was there a remaining question about that? Well, the government has tried to, I would say, manufacture a question. The answer is no. Ms. Cheyotta, in her declaration, said there wasn't. And even Mr. Vega, although he couldn't pin it down, he had several meetings with Ms. Cheyotta between October 30th when he was hired and November 2nd when the transfer was made. He couldn't identify exactly which meeting it was where he gave the advice, but there was no question that it was before the transfer was made. And that's corroborated by documents. The $100,000 transfer from Baja Exporting to Mr. Vega's firm was the morning of November 2nd. And I think it's fair to infer that Mr. Vega satisfied himself that that was a lawful transfer before it was made. But was that the issue? I'm sorry? Was that really the issue at trial? I thought the issue was whether or not the transfer was pertinent evidence that Ms. Cheyotta knew or should have known that these funds were the proceeds of the fraudulent scheme. So whether it was made before or whether the advice was given before the transfer or after the transfer would not affect the knowledge element. Well, the government wanted to show that this was a nefarious act, that her knowledge of the act, that her guilty knowledge could be inferred from the act itself. And the impression that was created at trial was that Ms. Cheyotta learned about the lawsuits being filed by 5-Hour Energy and shot this money out the door just as fast as she could, the suggestion being that this was done, it was done in a, with knowledge of Billy Gallagher. But isn't that a jury question? I'm sorry? Isn't that a jury question? It is absolutely a jury question, but the jury should have heard all the evidence. And the ---- But all Mr. Vega would have said was it was legal. And I told her it was legal. Exactly. But that's crucial. It is a much different picture, Your Honor, when someone, as the jury saw it at trial without Mr. Vega's testimony, the jury sees Ms. Cheyotta just suddenly shooting  Isn't the issue why she did that? I beg your pardon? Not whether, not the act of doing it, but the question was why she, wasn't the probative part of this why she did that, why she got rid of the, took the money out of the account? Well, she sent the money out to pay bills. There wasn't any real question about that. And she did it after she knew that 5-Hour Energy had frozen the assets of some other people who had been selling 5-Hour Energy. So the picture that was created for the jury was somebody with guilty knowledge trying to get money out the door as quick as she could. It's a much different picture when the person who's sending the money out goes to a lawyer, a reputable lawyer, and says, is it okay for me to send this money out? That, and I should add one other thing. But she was still getting the money out as quickly as she could. But she's doing it. Running down the street escaping is knowledge of guilt, but there's nothing illegal about it. She is, well, the government's whole theory was that this smacked of illegality, that this was evidence of consciousness of guilt. And it refutes that if you go and talk to a lawyer and say, here's what's going on. May I send this money? Is it okay to send this money? It was, it would have created a different picture of a key event in the case. I've used all my time. Yes, we'll give you a minute for rebuttal. Thank you very much, Your Honor. All right. Good morning. May it please the Court. Jonas Lerman for the United States. Your Honors, Mr. and Mrs. Sciotta received a fair trial, and you should affirm their convictions. The district court here scrupulously protected their rights and faithfully applied precedent. And the Sciotta's real complaint in this appeal is not with how Judge Koh exercised her discretion or the ruling she made. It's really with precedent. It's that they don't like the state of the law. But they have not shown that Judge Koh abused her discretion in any of her rulings, and those were careful, thoughtful rulings, and let alone that she plainly or clearly erred. I'm happy to address any of the issues in the case. I thought I'd start with the confrontation issue since that seems to be of particular interest. What's your response to counsel's comment about the relevance of Jameel's testimony in the earlier proceeding? As far as how it related to the government's overall case? Well, he said it was crucial. And I asked the question, could it be looked at as harmless error? It absolutely is harmless if it were. Because? Because it was only a small part of the government's case. Even the government referred to Waleed Jameel as a crook and a liar and as someone we can't trust. So if there's anything in this case that the parties agreed on, it's that Waleed Jameel was not a trustworthy person and that that's why in closing the government told the jury, you shouldn't believe anything he says unless you can corroborate it with other parts of evidence in the record. It's also not true that this was some overwhelming part of the government's case. The government called over a dozen witnesses. The star witnesses in the government's case were Kevin Ateek, Justin Sciotta, and the defendants themselves. I mean, recall that the defendants' own deposition testimony came in at trial with Bruton redactions. And those depositions of the defendants themselves were just damning, frankly. And that's what Judge Koh found in her Rule 29 and Rule 33 rulings. As to Adriana Sciotta, she went through six key pieces of evidence from Adriana Sciotta's own civil deposition. She made credibility findings. So the star witnesses against Mr. and Mrs. Sciotta were Mr. and Mrs. Sciotta. But why did you introduce the other depositions, then, if they were not that important to the case? Well, like I said, the Waleed Jameel deposition did corroborate certain other pieces of evidence. So, for example, Justin Sciotta testified that he emailed a bill to Adriana Sciotta that listed some incriminating terms like trucking, supplies, and ink. And that showed that Adriana Sciotta knew about the scheme and that she was part of it. Justin Sciotta testified that Waleed Jameel told him to send that invoice to Adriana Sciotta. So the questioning of Waleed Jameel corroborated pieces of evidence like that. But just as far as the unavailability and prior opportunity to confront issues, the legal questions here before the Court, I think it's important to go through those one by one, because Judge Koh did that very carefully and applied precedent and she found that all the requirements were satisfied. So ‑‑ Counsel, may I ask you, do you have a case where a civil deposition has been used in a criminal trial for an unavailable witness? Yes. What case says that? So we cited some cases on page 32 of our brief. The strongest case to support the proposition that it's proper to use testimony from a civil deposition in a criminal case. Sure. So the ‑‑ there's a published case from the Sixth Circuit, U.S. v. Vartanian. Have anything in the Ninth Circuit? We don't have a Ninth Circuit case right on point on this. So your strongest case is from the Sixth Circuit, and what's that case? United States v. Vartanian, V-A-R-T-A-N-I-A-N. That was civil trial testimony, and the witness ‑‑ But I asked you civil deposition testimony. And there's United States v. Paling, which is a Third Circuit case from 2014. That's also cited on page 32 of our brief. But this Court, I think this may be a distinction without a constitutionally significant difference, Your Honor, the difference between civil depositions and criminal depositions, because this Court has a series of cases where it's admitted criminal depositions at criminal trials. And for purposes of the confrontation and 804 analysis, we don't think there's a difference between civil and criminal depositions. Well, the issue in my mind in terms of the rule is whether or not there's a similar motive in a civil deposition to cross-examine and to delve into the issues that are pertinent in a criminal trial. That was my concern about the civil deposition. Yes. And I'd be happy to address that. So that prong applies only to Rule 804. So Crawford says that the two requirements under the Confrontation Clause are just unavailability and a prior opportunity to confront. By saying the rule. Yes. But if I can just get rid of those two elements first. There's no question about unavailability here. These witnesses invoked the Fifth Amendment privilege. Judge Koh made findings that they were unavailable. And there's also no question about a prior opportunity to confront, the second prong of the analysis, because the chiotas lawyer in the civil case did confront these witnesses. They were cross-examined during these civil depositions. Now, the chiotas at the criminal trial made the strategic choice not to introduce those cross-examinations. They could have done that. They chose not to do that. So now getting to the similarity of the motives under 804b1, Judge Koh again made careful findings where she compared the civil case to the criminal case, and she found that the motivations were substantially similar. So recall that under the. Is that enough to be substantially similar? She found that they were fundamentally similar. That was the language she used. And that is the standard this Court applies under McFaul and Geiger and other cases. And so in those cases, this Court has said that it's not a fine-grained approach. You look at the similarity of motives from a high level of generality. And here, Judge Koh, she compared the elements of the civil case to the criminal case, and she found that their interests, the chiotas' interests really were the same in both proceedings, including challenging state of mind, because there were cross-claims and other things that happened in the civil case where the chiotas' state of mind was really a key issue. So Judge Koh's findings on the similarity of motives, she goes through in detail. And this is at ER 149 to 153. And she found that the similar motives included blaming others for the scheme, that the chiotas were seeking to demonstrate that they were innocent of relabeling and counterfeiting, minimizing the amount owed. Judge Koh found that knowledge and intent were both relevant issues in the civil case, that's at ER 153. Willfulness was at issue in the civil case. So the motives really were very similar. They weren't identical, but that's not the standard. The standard is whether they were fundamentally the same or fundamentally similar. So again, Judge Koh applied this Court's precedent, and the chiotas, I think, complaint is really with that precedent. It's with the, I think, baseline proposition, as you spoke about with Mr. Samsell Jones, about whether 804b1 really does incorporate the standards of the Confrontation Clause. But what this Court said in Duenas was, quote, where the requirements of Rule 804b1 are met, we generally conclude that the Confrontation Clause is not violated. And that's the precedent that Judge Koh properly applied here. Unless the Court has other questions on that issue, I'll move on to ineffective assistance. I want to take issue with one, with a few things that Mr. Klein said. One is that he said that there was no question that the $2 million transfer was to pay bills. There absolutely was a question about that. In the civil deposition, Ms. Chiota was asked, have you ever transferred $2 million before? And she couldn't cite a single example where she's ever done that. She was asked, have you ever transferred $1 million before? And she couldn't cite an example of that. So this was absolutely at issue, you know, whether she was actually paying bills with this money. I would also note that Judge Koh found, after reviewing the record here and the interviews of the attorneys, that even according to Ms. Chiota and what Vegas said, was that he was merely told that Ms. Chiota was wondering whether it was legal for her to pay her bills. Not that Ms. Chiota asked, is it legal for me to make a $2 million transfer? Is it legal for me to transfer $2 million to my brother's company in Mexico and drain the account of Baja Exporting and remove my name as the signatory on the Baja Exporting bank account? He was merely asked, is it legal for me to pay my bills? And he said he didn't know of any legal impediment to her paying her bills. That's at ER 16 to 21. Those are Judge Koh's findings on that issue. But, again, I think Judge Koh didn't reach the question of deficient performance because she didn't need to reach it, because she could find easily, I think, that there was no prejudice. And she found this $2 million transfer issue was just one part of a mosaic of a lot of testimony against Ms. Chiota. Her counsel said today that the evidence was weak. That's not what Judge Koh found. Judge Koh found that the evidence strongly supported Ms. Chiota's conviction. And Judge Koh went through six key pieces of evidence that supported that conclusion. And, again, whether Mr. Vega had gotten up at trial and said, yes, I told her it was legal for her to pay her bills would not have changed the jury's assessment of this case overall. Counsel, do you agree with opposing counsel that this is one of those unusual cases when the ineffective assistance of counsel claim can be decided on direct appeal? Yes, we agree with that. The record is fully developed. And, as Mr. Klein said, there was a waiver of attorney-client privilege. And, as we said in our brief, we think there's an ample record here for this court to deny this claim on the merits. I'm happy to address the Bruton claim or anything else if the court has questions. But, otherwise, I'd submit on the briefs. It appears there are none. Thank you, counsel. Roboto. Your Honor, on the similar motive question, the government has not cited any case dealing with the prior testimony of a civil co-defendant. There is only one Federal case on that point. That is the Seventh Circuit's decision in Feldman, which is cited on page 43 of our brief. And the Seventh Circuit there said the testimony of a civil co-defendant cannot be admitted under 804b3 or 804b1, I'm sorry, for the reasons we've stated. Your Honor, I just also want to note one thing about the circumstances of the cross-examination of Mr. Jamil and his deposition. His deposition took place over four days, but it was extended out over a year. The Chiotas did not have an opportunity to cross him until October 30, 2013. By that point, they had already essentially settled the case with 5R Energy. The district court entered a settlement agreement only eight days later. So by the time they finally got a chance to cross him, the civil case was essentially done. They had no incentive to develop his testimony. They only questioned him on a couple of things about who got more money between Atik and Jamil. The reason they didn't admit that testimony at the criminal trial is because it was utterly irrelevant to the questions that were at issue in the criminal trial. On the question of harmlessness, Your Honor, I would just emphasize again that it is the government's burden to prove that this is harmless beyond a reasonable doubt. The government did not tell the jury, do not believe Mr. Jamil. What the government said, what Mr. Prelis said at the end of closing argument This is the last thing the jury heard. They said, yes, Mr. Jamil is a crook. That is why you can believe him, because Mr. Chiota knew he was a crook and that's why he hired him. And Mr. Jamil is telling you the truth about Mr. Chiota's knowledge and intent, because that was the government's only direct evidence on knowledge of intent. It cannot be held harmless, Your Honors. All right. Thank you, counsel. Second rebuttal. Your Honor. I'd like to talk briefly about the motive issue as well on the confrontation clause. This was a civil deposition, and in civil depositions, one, it is rarely the case that a lawyer will probe the testimony of someone as thoroughly as he would in cross-examination at trial. That was particularly the case here for the reason Mr. Sample-Jones has outlined. In addition to that, one lawyer was representing Mr. Chiota, Ms. Chiota, and the company. At trial, Ms. Chiota took a different position from Mr. Chiota. She somewhat pointed the finger at him to the point where he moved for a severance right after her opening statement. That was never going to happen in the civil deposition, where one lawyer represents all three people. The differences between Ms. Chiota and Mr. Chiota were never going to be brought out in that deposition, and they were not. All right. Thank you, counsel. Thank you to all counsel for your helpful arguments. The case just argued is submitted for decision by the court.
judges: Schroeder, O'scannlain, Rawlinson